## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:17-cv-01190-CMA

DANE GUSSIN,

      Plaintiff,

v.

DIGITALGLOBE, INC.,
GENERAL HOWELL M. ESTES III,
NICK S. CYPRUS,
ROXANNE DECYK,
LAWRENCE A. HOUGH,
WARREN C. JENSON,
L. ROGER MASON, JR.,
JEFFREY R. TARR,
KIMBERLY TILL,
EDDY ZERVIGON,
MACDONALD, DETTWILER AND ASSOCIATES LTD.,
SSL MDA HOLDINGS, INC., and
MERLIN MERGER SUB, INC.,

      Defendants.

---

## OPPOSITION TO PLAINTIFF'S MOTION FOR
## PRELIMINARY INJUNCTION (ECF NO. 19)

---

## INTRODUCTION

The proposed merger of DigitalGlobe, Inc. ("DGI") and MacDonald, Dettwiler and

Associates Ltd. ("MDA") has been vigorously negotiated, thoroughly vetted, and fully

disclosed.  That has not stopped Plaintiff from asking this Court to grant the

extraordinary remedy of enjoining DGI's July 27, 2017 stockholder vote on the deal.

Plaintiff, however, comes nowhere close to justifying the intervention he seeks.

- 1 -

The proposed merger is spelled out in the amended F-4 Registration Statement (the "Amended F-4"), which spans over 300 pages and discloses an array of financial projections and analyses, including all material information shareholders need to evaluate the transaction.  The Amended F-4 has, in turn, been reviewed and cleared by the Securities and Exchange Commission (the "SEC"), which identified none of the concerns that animate Plaintiff's Motion.  Not only does his Complaint already face the stringent pleading standards of a federal securities action, but his Motion for injunctive relief must satisfy an even more rigorous burden—a "clear and unequivocal" right to relief.  Instead, Plaintiff engages in baseless speculation about what details the Amended F-4 might have omitted, quibbling over minutiae that courts neither consider material nor require companies to disclose.

Given the Amended F-4's robust disclosures, from the comprehensive projections to the search for strategic alternatives to the fairness opinions of two financial advisors, Plaintiff cannot show that he is likely to succeed on the merits.  Nor can he show that he is likely to suffer irreparable harm without an injunction, especially since his Complaint contemplates damages and rescission as potential remedies.  The balance of equities in no way favors Plaintiff, who proposes to usurp the right of all other DGI stockholders to capitalize on MDA's offer of a meaningful premium.  And when evaluating the effect on the public interest, federal courts routinely refuse to issue an injunction where there is no competing offer, as is the case here.

Plaintiff's strategy is typical of the shareholder lawsuits that unfortunately greet mergers involving publicly traded companies.  Since the Delaware Court of Chancery

heightened the standard for disclosure-only settlements in *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884 (Del. Ch. 2016), opportunistic plaintiffs have increasingly crafted their complaints as federal securities actions to gain access to the U.S. District Courts.[1]   Often, these so-called strike suits "ask[] primarily or even exclusively for disclosure of details of the proposed transaction" but in reality are "filed on behalf of shareholders of one of the companies for the sole purpose of obtaining fees for the plaintiffs' counsel." *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 721 (7th Cir. 2016).   Unsurprisingly, four identical putative shareholder class actions have already been filed against DGI, all of which are pending in this District.

Despite being a member of all four putative classes, Plaintiff is proceeding as an individual.   In other words, a single disgruntled shareholder is seeking to disrupt a $3.6 billion deal entirely for his own benefit.   This Court should deny Plaintiff's Motion and let the other stockholders decide for themselves whether to approve the merger based on the extensive disclosures already in the Amended F-4.

## STATEMENT OF FACTS

On February 24, 2017, DGI, a leading global provider of Earth imagery, data, and analysis, and MDA, a global communications and information company providing technology solutions to commercial and government organizations worldwide, announced that they had entered into a merger agreement.   Compl. ¶ 2.   Under the

---

[1] *See* Matthew D. Cain, Jill E. Fisch, Steven Davidoff Solomon & Randall S. Thomas, *The Shifting Tides of Merger Litigation*, Univ. of Pennsylvania Law School, Legal Scholarship Repository, Mar. 2017, at 5, 33–35, *available at* http://scholarship.law. upenn.edu/cgi/viewcontent.cgi?article=2730&context=faculty_scholarship.

agreement, MDA will acquire DGI for a combination of cash and MDA stock valued at $35 per share as of February 16, 2017, the last trading day before media reports surfaced that DGI and MDA were in merger discussions.  Ex. B at viii.[2]  That represented an 18% premium over DGI's closing price on February 16, 2017.  *Id.*

The proposed merger reflects the culmination of months of intense negotiations. In November 2016, MDA presented its first non-binding indication of interest, consisting of an all-stock transaction without any premium to the DGI trading price, with no recourse to DGI if the deal was terminated for regulatory reasons and no commitment to keep DGI in the United States.  *Id.* at 62–76.  By the time the merger agreement was signed, the Board had obtained, in addition to the premium, a $150 million reverse termination fee payable to DGI under certain conditions and a commitment from MDA to domicile DGI's ultimate parent in the United States by the end of 2019.  *Id.*

Even with these concessions, the Board approved the merger only after carefully considering other strategic alternatives.  For example, the Board held 10 meetings and retained two financial advisors to consult on the deal and provide fairness opinions: Barclays Capital Inc. ("Barclays") and PJT Partners LP ("PJT," and together with Barclays, the "Financial Advisors").  *Id.*  To assist in reviewing potential strategic alternatives, the Board also formed a Transactions Committee, which itself held 11 meetings.  *Id.*  And at the direction of the Board, DGI and the Financial Advisors reached out to four other potential strategic acquirers and one strategic investor,

---

[2] References to "Ex. __" are to the exhibits attached to the Declaration of William K. Pao filed contemporaneously herewith.

ultimately signing non-disclosure agreements with four.  *Id.*  Only after it was clear that none of these parties wished to proceed did the Board approve the merger.  *Id.*

On April 27, 2017, MDA and DGI filed the preliminary F-4 Registration Statement (the "Preliminary F-4"), a 291-page document containing comprehensive information on the merger process as well as extensive financial analysis.  Ex. A. To facilitate discussions leading up to the merger, both DGI and MDA management prepared certain projections for consideration by their respective boards and the Financial Advisors, all of which are fully disclosed in the Preliminary F-4.

For example, the Preliminary F-4 discloses DGI management's projections for three separate scenarios if DGI were to continue as a standalone company, using different revenue assumptions for key programs and businesses in the next five years (the "Scenario 1, 2, and 3 Projections").[3]  *Id.* at 105–13.  Also included are the projected synergies that the merger would bring to the combined company, and the standalone version of the net operating losses included in the Scenario 1 Projections.  *Id.*  Similarly, the Preliminary F-4 contains five-year projections for MDA prepared by MDA management, and a version of these projections as revised by DGI management.[4]  *Id.*

In addition, the Preliminary F-4 devotes 23 pages to the analyses underlying the Financial Advisors' fairness opinions.  *Id.* at 83–105.  For example, the Preliminary F-4

---

[3] This means that for DGI, the Preliminary F-4 provides three different sets of estimated revenue, EBITDA (both pre- and post-stock-based compensation), capital expenditures (excluding capitalized interest), and levered and unlevered cash flow.  *Id.* at 105–13.
[4] Thus, for MDA, the Preliminary F-4 provides two different sets of estimated revenue, EBITDA (both pre- and post-stock-based compensation), capital expenditures (excluding capitalized interest), and levered and unlevered cash flow.  *Id.*

extensively explains the Financial Advisors' discounted cash flow ("DCF") analysis, laying out in detail how free cash flow, terminal values, discount rates, and implied share price were calculated—including what factors were considered[5]—and providing similar breakdowns for other valuation methodologies.[6]

The Preliminary F-4 also discloses the Financial Advisors' previous engagements with MDA or DGI in the prior two years—to the extent any such engagements exist—spelling out the nature and timing of each. *Id.* at 93–94, 104–05. And it contains a 10-page section devoted to the interests of the Board and DGI's executive officers, making clear that they may "have interests in the merger that are different from, or in addition to, those of [DGI] shareowners generally," and that "three members of the [DGI] board of directors will be appointed to the MDA board of directors." *Id.* at 18, 114–23.

Despite the Preliminary F-4's robust disclosures, it took less than a week for lawyers to begin filing near-identical complaints. From May 3 to May 22, 2017, five lawsuits were filed, each making conclusory allegations of purported omissions in the Preliminary F-4 and seeking to recover under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9. Four of the five are putative class actions; three were filed in Colorado and one in Delaware.[7] This case is the lone individual action, with Plaintiff bringing suit solely on behalf of himself. *See* Compl.

---

[5] *See, e.g.*, *id.* at 89 (explaining that terminal values were "estimated by applying perpetuity growth rates of 1.5% to 2.5% to the Scenario 1 projections, the Scenario 2 projections and the Scenario 3 projections").
[6] *See id.* at 83–105.
[7] The other actions are: (1) *Assad v. DigitalGlobe, Inc., et al.*, No. 1:17-cv-01097-NYW (D. Colo.) (filed May 3, 2017); (2) *Jeweltex Manufacturing Inc. Retirement Plan v.*

On May 24, 2017, after reviewing the Preliminary F-4, including the same disclosures at the crux of this case, the SEC identified no red flags.  It issued a small number of comments—nine total—none of which relate to any of the allegations raised in Plaintiff's Motion.  *See* Ex. C.  On June 2, 2017, after addressing the SEC's comments, MDA and DGI filed the Amended F-4 and set a stockholder vote for July 27, 2017.  Ex. B at 54.  A few days later, on June 5, 2017, the plaintiff in the Delaware action moved for a preliminary injunction to enjoin the DGI stockholder vote.  *See* Ex. D.

On June 13, 2017, in the interest of efficiency, Defendants moved to consolidate the four cases filed in Colorado.  ECF No. 17.  While the other plaintiffs readily consented, Plaintiff in this action refused.  *See id*.  The very next day, Plaintiff filed this Motion, ECF No. 19, which is almost entirely duplicative of the preliminary injunction motion filed in Delaware. Well-aware of the pending lawsuits, which are disclosed in the Amended F-4, the SEC has now cleared the Amended F-4 without further comments.[8]

## ARGUMENT

Preliminary injunctive relief is "an extraordinary remedy" that may be awarded only if the movant's right to relief is "clear and unequivocal."  *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted). Granting such drastic relief "is the exception rather than the rule."  *GTE Corp. v.*

---

*DigitalGlobe, Inc., et al.*, No. 1:17-cv-01140-STV (D. Colo.) (filed May 8, 2017); (3) *Bussey v. DigitalGlobe, Inc., et al.*, No. 1:17-cv-01159-MEH (D. Colo.) (filed May 10, 2017); and (4) *Zand v. DigitalGlobe, Inc., et al.*, C.A. No. 17-592-RGA (D. Del.) (filed May 22, 2017).  The *Zand* action has since been transferred to the District of Colorado.
[8] *See* SEC Notice of Effectiveness, *available at* https://www.sec.gov/Archives/edgar/data/1121142/999999999517001561/xslEFFECTX01/primary_doc.xml.

*Williams*, 731 F.2d 676, 678 (10th Cir. 1984).  To obtain a preliminary injunction, the

movant must demonstrate: "(1) a substantial likelihood of prevailing on the merits; (2)

irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs

the harm that the preliminary injunction may cause the opposing party; and (4) that the

injunction, if issued, will not adversely affect the public interest."  *Diné Citizens*, 839

F.3d at 1281 (citation omitted).  The movant must make a "*clear showing*" that all four

factors weigh in favor of an injunction.  *Johnson & Johnson Vision Care, Inc. v. Reyes*,

665 F. App'x 736, 740–41, 747 (10th Cir. 2016) (emphasis in original).

As the Tenth Circuit has reiterated, "any modified test which relaxes one of the

prongs for preliminary relief and thus deviates from the standard test is impermissible."

*Diné Citizens*, 839 F.3d at 1282; *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,

854 F.3d 1236, 1245–46 (10th Cir. 2017) (same).  That includes "the requirement that

the plaintiff must show he is likely to succeed on the merits."  *Diné Citizens*, 839 F.3d at

1282.  Thus, contrary to Plaintiff's contention, it is not enough to show that "questions

going to the merits are so serious, substantial, difficult, and doubtful as to make the

issue ripe for litigation and deserving of more deliberate investigation."  *Id.*  Not only

does Plaintiff fail to show that he is in fact likely to prevail on the merits, but all four

factors weigh against the extraordinary remedy Plaintiff seeks.

**I.      Plaintiff Fails to Demonstrate That His Claims Are Likely to Succeed.**

Plaintiff comes nowhere close to showing a substantial likelihood of success on

the merits.  To prevail on his Section 14(a) claim, Plaintiff must prove that the Amended

F-4 contains a material misrepresentation or omission, Defendants were at least

negligent, and the Amended F-4 itself was an essential link in completing the transaction.[9]  *See In re ZAGG Sec. Litig.*, 2014 WL 505152, at *7 (D. Utah Feb. 7, 2014), *aff'd*, 797 F.3d 1194 (10th Cir. 2015).  Because the crux of Plaintiff's case is that the Amended F-4 contains omissions—as opposed to affirmative misrepresentations— Plaintiff must show either that SEC regulations explicitly require disclosure of the omitted material information at issue or that the omission makes other statements in the Amended F-4 "materially false or misleading."  *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (quotations omitted).  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," meaning "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Plaintiff's Section 14(a) claim is also subject to the heightened pleading standard of the Private Securities Litigation Reform Act (the "PSLRA"), which Congress enacted "to curb frivolous, lawyer-driven litigation."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re ZAGG Sec. Litig.*, 2014 WL 505152, at *4 (applying heightened pleading standard to Section 14(a) claims and finding "the [PSLRA] statutory language unambiguous").  Thus, to survive the pleadings stage, Plaintiff must plead with particularity the statements alleged to have been misleading and the reason(s) why those statements are misleading.  *See* 15 U.S.C. § 78u-4(b)(1).

---

[9] To recover under Section 20(a), Plaintiff must first establish a primary violation under Section 14(a).  *See* 15 U.S.C. § 78t(a).  Because Plaintiff has not shown he is likely to succeed on his Section 14(a) claim, his Section 20(a) claim necessarily fails.

In his Motion, Plaintiff focuses on three categories of alleged omissions: (a) information about DGI's and MDA's financial projections and the Financial Advisors' analyses; (b) information about the alleged conflicts of interest of DGI's officers and directors; and (c) information about the Financial Advisors' alleged conflicts of interest.[10] Mot. at 8–15, 17–20.  As a threshold matter, however, Plaintiff does not make a "clear showing" that any of the alleged omissions rendered any specific statement in the Amended F-4 misleading.  Instead, Plaintiff contends only that the alleged omissions generally rendered whole sections of the Amended F-4 misleading.  *See, e.g.*, Compl. ¶¶ 4, 36, 64.  But courts have consistently found such allegations too conclusory to state a Section 14(a) claim.  *See, e.g.*, *La. Mun. Police Emps. Ret. Sys. v. Cooper Indus. PLC*, 2012 WL 4958561, at *8 (N.D. Ohio Oct. 16, 2012) ("[P]laintiff must identify a precise 'statement' in a proxy that is either affirmatively misleading or that is rendered misleading by the operation of a materially omitted fact.").  Plaintiff's Section 14(a) claim fails for this reason alone.  Further, Plaintiff's claim also fails because Plaintiff does not make a "clear showing" that the alleged omissions are material.

### A.   The Amended F-4 properly discloses the Financial Advisors' analyses and the relied-on financial projections.

Plaintiff contends that the Amended F-4 contains material omissions because it (1) fails to disclose all the details underlying the Financial Advisors' analyses, and (2)

---

[10] Plaintiff also makes a conclusory, throw-away argument that the Amended F-4 failed to explain what "near term" meant when it disclosed that Party A told DGI that it "was not able to pursue [a joint venture] in the near term."  Mot. at 15.  But this argument is not even colorable.  The meaning is clear: Party A is unable to pursue a deal in the time that the DGI Board must make a decision on the merger.

improperly omits a reconciliation of the management projections to U.S. GAAP-based financial statements.  Plaintiff is wrong on both counts.

### 1. The Amended F-4 provides a fair summary of the Financial Advisors' analyses, including the relied-on projections.

Plaintiff contends that the Amended F-4 is "materially false and misleading" because it omits details of the Financial Advisors' analyses, including certain inputs that went into DGI's and MDA's financial projections (e.g., estimated interest, tax expense, depreciation and amortization, and other cash flow items) and other components of the Financial Advisors' valuation methodologies (e.g., ranges of terminal values used in the DCF analyses).  Mot. at 8–11.  But all that the law requires is disclosure of a "fair summary" of the financial advisor's work.  *See Trulia*, 129 A.3d at 900 (stockholders are entitled to only "'a fair summary of the substantive work performed by the investment bankers'").  By definition, a fair summary "need not contain all information underlying the financial advisor's opinion or contained in its report to the board."  *Id.*  Instead, a fair summary is only "an accurate description of the advisor's methodology and key assumptions."  *Id.* at 901.  If the law required more granular disclosures, companies would "bury the shareholders in an avalanche of trivial information" that is "hardly conducive to informed decisionmaking."  *TSC Indus.*, 426 U.S. at 448–49.

Here, there is no question that the Amended F-4 more than satisfies the "fair summary" standard.  The Amended F-4 features a 22-page, single-spaced summary of the Financial Advisors' analyses and opinions.  Ex. B at 84–105.  It also discloses detailed information about DGI's and MDA's financial projections, including estimated revenue, EBITDA (both pre- and post-stock-based compensation), and levered and

unlevered cash flow.  *Id.* at 105–14.  The Amended F-4 even includes DGI's standalone prospects under three different scenarios.[11]  *Id*.  The SEC has reviewed the disclosure twice and found no issue with these disclosures.

Plaintiff contends that the alleged omissions are necessary so that he can "project the future financial performance" of DGI and "better understand" the Financial Advisors' work.  Mot. at 11.  But that is not the appropriate inquiry: the issue is whether (1) the SEC requires disclosure of the details Plaintiff seeks, or (2) the omitted information makes other statements in the Amended F-4 "materially false or misleading."  *Seinfeld*, 461 F.3d at 369.  Plaintiff's conclusory statements falls far short of the "clear showing" he must make to justify a preliminary injunction.  Indeed, in an action in which he purports to represent only himself, Plaintiff failed to do the bare minimum of submitting a declaration explaining how the additional details he now demands could possibly affect even his own voting decision.

Contrary to Plaintiff's contention, the Amended F-4 need not disclose every piece of raw data considered by the Financial Advisors or the Board.  *See, e.g.*, *Assad v. Mines Mgmt., Inc.*, 2016 WL 4611573, at *4 (E.D. Wash. Sept. 2, 2016) ("[Plaintiff] cites no authority for the proposition that all material considered by a financial advisor in the course of evaluating a proposed transaction is material and must be included in a proxy statement.  In fact, there is substantial authority to the contrary."); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *16 (Del. Ch. Mar. 7, 1991) ("A proxy statement

---

[11] Each scenario is based on a different set of revenue assumptions for three of DGI's key programs and businesses for the next five years.  Ex. B at 105–14.  The specific assumptions are all fully disclosed in the Amended F-4.  *Id*.

need not disclose all the wealth of detail presented to or considered by the corporation's

directors and advisors, whether or not material.").  Plaintiff makes no showing that the

SEC requires disclosure of the raw data beyond what the Amended F-4 discloses, or

that the data at issue is material and their omission rendered any statements in the

Amended F-4 misleading.[12]  *See* Ex. B at 84–114.  And "[a]lthough all of this granular

information might be of interest to [] shareholders, the information regarding revenue,

EBITDA, and cash-on-hand already provided in the Proxy Materials is sufficient to allow

shareholders to evaluate the Proposed Transaction."  *In re Answers Corp. S'holders*

*Litig.*, 2011 WL 1366780, at *7 (Del. Ch. Apr. 11, 2011).

Further, courts have repeatedly rejected arguments, like Plaintiff's here, that

stockholders need "information so extensive and detailed as to permit [them] to make

an independent determination of fair value or recreate the analysis of a financial

advisor."  *Malon v. Franklin Fin. Corp.*, 2014 WL 6791611, at *6 (E.D. Va. Dec. 2, 2014).

For example, in *Himmel v. Bucyrus International, Inc.*, the plaintiff sought, among other

things, a certain component used in the financial advisor's DCF analysis, i.e.,

information on the range of EBITDA multiples.  2014 WL 1406279, at *19 (E.D. Wis.

Apr. 11, 2014).  As the court noted, "plaintiff appears to be seeking detailed information

so that shareholders could perform their own financial analyses."  *Id.* at *20.  The court

---

[12] And contrary to Plaintiff's contention, *see* Mot. at 10, the Amended F-4 need not
explain the specific rationale behind every decision the Financial Advisors made in
arriving at their fairness opinions.  *See, e.g.*, *Sodhi v. Gentium S.p.A.*, 2015 WL 273724,
at *5–6 (S.D.N.Y. Jan. 22, 2015) (holding allegation that proxy "left out [financial
advisor's] reasons for selecting perpetuity growth rates . . . clearly falls into the category
of underlying details supporting a fairness opinion that need not be disclosed")
(quotations omitted).

made clear "that is not the standard for material information." *Id.*; *see also Gottlieb v. Willis*, 2012 WL 5439274, at \*5–6 (D. Minn. Nov. 7, 2012); *In re Saba Software, Inc. Stockholder Litig.*, 2017 WL 1201108, at \*11 (Del. Ch. Mar. 31, 2017).

### 2. SEC Regulation G does not apply to the Amended F-4's non-GAAP projections, and, thus, no further reconciliation is required.

Contrary to Plaintiff's claim, 17 C.F.R. § 244.100 (or "SEC Regulation G") does not require DGI to disclose a reconciliation of the management projections to U.S. GAAP-based financial statements. Mot. at 8–9. That is why the SEC never encouraged or required DGI to provide this reconciliation when the SEC reviewed both the Preliminary F-4 and Amended F-4.

By its own terms, SEC Regulation G has no application where, as here, the financial projections were provided to financial advisors and disclosed in connection with a proposed merger in accordance with the requirements of the SEC's Form F-4 and, specifically, Item 1015(b) of Regulation M-A. Subsection (d) of SEC Regulation G expressly states that the regulation "shall not apply to a non-GAAP financial measure included in disclosure relating to a proposed business combination . . . if the disclosure is contained in a communication that is subject to . . . § 229.1015 of this chapter" or "Item 1015." 17 C.F.R. § 244.100(d). In turn, Form F-4 is a communication subject to Item 1015,[13] which applies to financial disclosures in proxy statements relating to

---

[13] *See* Item 4(b) of Form F-4 and paragraphs (b)(1) through (b)(6) of Item 1015 of Regulation M-A. In 2008, the SEC corrected an inaccurate cross-reference in Item 4(b) of Form F-4 that referenced Item 9(b)(1)–(6) of Schedule 13E-3, noting that instead, Form F-4 "should refer to Item 1015(b) of Regulation M-A." SEC Release No. 34-

fairness opinions provided by financial advisors.  17 C.F.R. § 229.1015(a) (governing

disclosure on "[a]ny report [or] opinion . . . relating to the consideration or the fairness of

the consideration to be offered to security holders").

There is no question that SEC Regulation G does not apply to the non-GAAP

projections in the Amended F-4.  These projections were provided to and relied on by

the Financial Advisors for the purpose of their fairness opinions, and, thus, Form F-4

and Item 1015 require their disclosure.  *See, e.g.*, Ex. B at 84 (noting that in preparing

its fairness opinion, PJT reviewed the Scenario 1, 2, and 3 Projections).  As a result of

the inclusion of these projections in a disclosure relating to a proposed business

combination (the merger) in a communication subject to Item 1015 (the Amended F-4),

Subsection (d)'s exemption from SEC Regulation G applies.  As the SEC has made

clear, the entire purpose of the Subsection (d) exemption was so that SEC Regulation

G's reconciliation requirement would not apply to forecasts and projections for proposed

business combination transactions.[14]  Thus, while SEC Regulation G has existed for

over 14 years, it is unsurprising that Plaintiff cannot cite a single case in which a court

has found a Section 14(a) violation based on this theory.

---

55146A, dated March 17, 2008, published at 73 Federal Register 17810 (April 1, 2008), *available at* https://www.sec.gov/rules/final/2008/34-55146afr.pdf.
[14] SEC Final Rule: Conditions for Use of Non-GAAP Financial Measures, *available at* https://www.sec.gov/rules/final/33-8176.htm ("[W]e are including in Regulation G an exception for non-GAAP financial measures included in disclosure relating to a proposed business combination transaction . . . if the disclosure is contained in a communication that is subject to the Commission's communications rules applicable to business combination transactions.").

More importantly, the SEC itself *twice* reviewed the non-GAAP projections at issue and did not demand reconciliation under SEC Regulation G.  Tellingly, after MDA and DGI submitted the Preliminary F-4, the SEC provided only nine comments—none of which addressed Plaintiff's contention that reconciliation is required.  Ex. C.  And after MDA submitted the Amended F-4, the SEC cleared the filing.  Surely the SEC would have raised reconciliation in its comments if SEC Regulation G were in fact applicable in this context.[15]  While not alone dispositive, "the SEC's review and clearance of the [] [Amended F-4]" is entitled to "some weight" and belies Plaintiff's claim that SEC Regulation G governs here.  *Deborah G. Mallow IRA SEP Inv. Plan v. McClendon*, 2012 WL 2036748, at *3 (W.D. Okla. June 6, 2012).

> **B.**     **The Amended F-4 adequately discloses any potential conflicts of the DGI officers and directors.**

Despite the Amended F-4's 10-page section titled "Interests of DigitalGlobe's Directors and Executive Officers in the Merger," Plaintiff complains that the Amended F-4 fails to disclose material information about DGI's officers' and directors' potential conflicts of interest.  Mot. at 11.  Plaintiff is wrong on both the law and the facts.

Plaintiff's contention that the Amended F-4 improperly omits specifics on "the timing and nature of all communications regarding future directorship and/or employment of DGI's directors and officers" is meritless on its face.  As an initial matter, the Amended F-4 fully discloses that "[p]ursuant to the merger agreement, . . . the MDA

---

[15] Plaintiff relies on a 2016 speech by former SEC Commission Chair Mary Jo White, Mot. at 9, which concerns periodic filings not at issue here.  Nothing in that source purports to address the disclosure of non-GAAP financial measures in the context of summarizing a financial advisor analysis of a proposed business combination.

board of directors is required to appoint three individuals (each a 'DigitalGlobe designee') as mutually agreed upon in good faith by MDA and DigitalGlobe (each of whom must have been serving as a director of DigitalGlobe as of February 24, 2017)." Ex. B at 77.  It also discloses that "at least one of the DigitalGlobe designees will be appointed to each of the MDA board of directors' Audit Committee, Human Resources and Management Compensation Committee and Governance and Nominating Committee," and that MDA and DGI ultimately agreed to appoint DGI directors General Howell M. Estes III, L. Roger Mason, Jr., and Nick S. Cyprus as MDA directors.  *Id.*

Plaintiff insinuates that General Estes and Messrs. Mason and Cyprus were appointed before the merger was announced, thus raising "serious questions" about their ability to "exercise independent judgment."  Mot. at 11.  Plaintiff, however, has no evidence or basis to make this bald assertion.  The Amended F-4's "Background of the Merger" section would have disclosed any facts in this regard if any existed.  That it did not means "there is nothing to disclose," and Plaintiff has not shown otherwise.  *In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2291842, at *19–20 (Del. Ch. May 25, 2010) ("The absence of a disclosure means there is nothing to disclose.").

"[U]nsupported speculation" about "additional, undisclosed conflicts of interest is insufficient to state a claim."  *IBEW Local 98 Pension Fund v. Central Vt. Pub. Serv. Corp.*, 2012 WL 928402, at *13 (D. Vt. Mar. 19, 2012).  Indeed, Plaintiff not only has no proof that the appointments occurred pre-announcement, but he does not even make the allegation outright, instead resorting to innuendo.  *See* Mot. at 11 (implying something insidious must have occurred when DGI's and MDA's CEOs met on January

31, 2017, because "[the Amended F-4] suggests a significant decrease in the Individual Defendants' efforts to explore potential strategic alternatives to the Proposed Transaction after that January 31, 2017 meeting").  In any event, numerous courts have found that post-merger directorships are not per se conflicts of interest.  *See, e.g.*, *Keyser v. Commonwealth Nat'l Fin. Corp.*, 644 F. Supp. 1130, 1144–45 (M.D. Pa. 1986) (continuation of board as directors post-merger did not "constitute serious conflicts which would require disclosure in proxy materials").  Here, even though the burden is on Plaintiff to make a "clear showing" that a preliminary injunction is warranted, Plaintiff has failed to adequately allege—let alone show—how there are conflicts here.

Similarly, there is no merit to Plaintiff's conjecture that Dr. Walter Scott—DGI founder, Executive Vice President, and Chief Technical Officer—was conflicted by exercising DGI stock options after the media reported that MDA was in talks to acquire DGI.  Mot. at 13.  After all, the Form 4 filed with the SEC in connection with his sales makes clear they were made in accordance with a Rule 10b5-1 plan, which allows sales of a predetermined number of shares at a predetermined time.  Ex. E (indicating that "[t]he exercise and sale reported were effected pursuant to a Rule 10b5-1 trading plan"); 17 C.F.R. § 240.10b5-1(c).  Thus, contrary to Plaintiff's suggestion, Scott had no incentive to be "the source of th[e] leak," nor did the Board have reason to "investigate" Scott's stock sale.  Mot. at 13.  Again, the Amended F-4 does not disclose this information because "the law does not require disclosure of facts that do not exist." *Savior Assocs. v. Goncalves*, 2013 WL 3026257, at *4 (S.D. Fla. Apr. 8, 2013).

**C.   The Amended F-4 adequately discloses information about any alleged conflicts of interest involving the Financial Advisors.**

Finally, Plaintiff contends that the Amended F-4 fails to disclose "material information" on the Financial Advisors' alleged conflicts. Mot. at 14. Specifically, Plaintiff accuses the Amended F-4 of omitting information on (1) the Financial Advisors' past services to MDA and DGI, and (2) the Financial Advisors' current services with respect to the merger. *Id.* These claims are mere insinuations and fail to satisfy the "clear showing" necessary for a preliminary injunction to issue.

**1.   The Amended F-4 properly discloses the Financial Advisors' previous services to DGI and MDA.**

With regard to past services to MDA, there is simply nothing to disclose. Item 1015 of Regulation M-A requires disclosure only of "material relationship[s] that existed during the past two years . . . and any compensation received" as a result. 17 C.F.R. § 229.1015(b)(4). Here, Plaintiff does not—and cannot—allege that PJT or Barclays provided services to MDA in the past two years. Nor is there merit to Plaintiff's demand that the Amended F-4 disclose "the amount of compensation received by Barclays for the past services it provided to DGI." Mot. at 14. The Amended F-4 fully discloses that Barclays, in addition to work on this transaction, served as Lead Arranger and Bookrunner of DGI's 2016 Secured Credit Facility and Sole Dealer Manager and Solicitation Agent on the associated tender offer, and received "customary fees for such services." Ex. B at 105.

As for the specific amount of the "customary fees" Barclays received from DGI on the credit facility, courts routinely dismiss conclusory demands for disclosure of a

financial advisor's compensation for prior unrelated services.  For example, in *In re Micromet, Inc. S'holders Litig.*, the Court of Chancery rejected the plaintiff's contention that solicitation materials needed to disclose the "actual amounts" the target company paid to its financial advisor for past services.  2012 WL 681785, at *12 (Del. Ch. Feb. 29, 2012).  As the *Micromet* court reasoned, the materials already disclosed that the financial advisor previously received compensation for advising the target company, and the plaintiffs "fail[ed] to provide any persuasive explanation [ ] as to why the actual amount of fees paid by [the target company] to [its financial advisor] would be material to shareholders or to cite any Delaware case law mandating such disclosures."  *Id.*[16]

### 2. The Amended F-4 properly discloses the Financial Advisors' current services with respect to the merger.

Likewise, Plaintiff's demand for additional disclosures on the Financial Advisors' current services is not even colorable.  The Amended F-4 discloses precisely what Plaintiff claims is missing.  Plaintiff contends that the Amended F-4 should have disclosed "whether the estimated compensation of $36 million and $18 million payable to PJT Partners and Barclays, respectively, is contingent on the consummation of the Proposed Transaction."  Mot. at 14.  But the Amended F-4 makes clear that the estimated compensation of $36 million to PJT and $18 million to Barclays "will be

---

[16] None of Plaintiff's cases purportedly supporting his demand for additional disclosures on the Financial Advisors' potential conflicts is on point.  In three of the cases, the financial advisors stood to gain an unusual benefit upon consummation of the transaction—beyond a standard contingency fee.  *See* Mot. at 19–20.  The remaining case involves a board reelection where the proxy omitted information "go[ing] to the independence or disinterest of directors who are identified as the company's 'independent' or 'not interested' directors."  *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11 (Del. Ch. 2002).

payable *at the closing of the merger*." Ex. B at 94, 105 (emphasis added).

Contrary to Plaintiff's claim, the Amended F-4 also discloses the Board's reasons for engaging Barclays after PJT: "the Transactions Committee was of the opinion that Barclays would be well-suited to advise on MDA's business." *Id.* at 69. Plaintiff seizes on the routine phrase "among other reasons" and speculates—falsely—that perhaps Barclays was engaged due to a "potential or perceived conflict of interest on the part of PJT Partners." Mot. at 14. Plaintiff offers zero evidence to support this conjecture. In any event, it is indisputable that a second fairness opinion is a benefit to stockholders, and the Board is under no duty to disclose its reasons for retaining another financial advisor. *See In re Saba*, 2017 WL 1201108, at *9 (explaining court "typically is not receptive to [the] kinds of 'why' or 'tell me more' disclosure claims that criticize the board for failing to explain its motives when making transaction-related decisions") (citations omitted). "Asking 'why' does not state a meritorious disclosure claim" because the law requires disclosure of "*all material facts*"—not "the grounds of [the board's] judgment for or against a proposed shareholder action." *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011) (emphasis in original, quotations omitted).

## II.   Plaintiff Cannot Demonstrate That He Faces Irreparable Harm.

Even if Plaintiff could somehow make a "clear showing" of a likelihood of success on the merits, injunctive relief is improper because Plaintiff cannot show that he would suffer irreparable harm in the absence of such relief. "[A]n injury must be certain, great, [and] actual"—not "[m]erely serious or substantial"—to constitute irreparable harm. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). To show irreparable

harm, "a plaintiff must demonstrate a significant risk that he or she will experience harm

that cannot be compensated after the fact by money damages." *N.M. Dep't. of Game &

Fish*, 854 F.3d at 1250 (quotations omitted).

Courts routinely hold that money damages provide an adequate remedy for

Section 14(a) claims.[17]  In an attempt to establish irreparable harm, Plaintiff relies

almost exclusively on Court of Chancery decisions involving different claims and

different facts—none of which allege federal securities violations.  *See* Mot. at 20–23.

Further, those decisions rely on the Delaware preliminary injunction standard, but this

Court must "look[] to federal law to interpret the standard for finding irreparable harm,"

and federal courts have explicitly "rejected the *per se* rule advocated by Plaintiff—that

'denying stockholders their right to cast an informed vote constitutes irreparable harm.'"

*Masters*, 996 F. Supp. 2d at 885–86.  And while Plaintiff cites four federal securities

cases, none involve a court enjoining a stockholder vote on a merger.[18]

---

[17] *See, e.g.*, *Orlando v. CFS Bancorp, Inc.*, 2013 WL 5797624, at *5 (N.D. Ind. Oct. 28, 2013) (denying motion for preliminary injunction in Section 14(a) merger case "because the court could later undo the damage caused by any alleged (but not adequately specified) illegal proxy statement by providing monetary damages—which typically constitutes an adequate remedy at law"); *Erickson v. Hutchinson Tech. Inc.*, 158 F. Supp. 3d 751, 760 (D. Minn. 2016) (same); *Masters v. Avanir Pharm., Inc.*, 996 F. Supp. 2d 872, 886 n.8 (C.D. Cal. 2014) (same).

[18] *See Lone Star Steakhouse & Saloon Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001) (enjoining *shareholder* from voting proxies obtained in violation of securities laws in context of corporate election); *MONY Grp., Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 140 (2d Cir. 2004) (enjoining *shareholders* from including duplicate of proxy card with solicitation to vote *against* merger); *St. Louis Police Ret. Sys. v. Severson*, 2012 U.S. Dist. LEXIS 152392, at *16–17 (N.D. Cal. Oct. 23, 2012) (injunction in context of management compensation amendments); *Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199 (D. Md. 1976) (injunction in tender offer context).

Further, Plaintiff is wrong that irreparable harm exists because "the merger cannot be undone." Mot. at 22. Plaintiff's own Complaint contemplates the possibility of post-closing relief. For example, Plaintiff asks the Court to "rescind[] [the merger] and set[] it aside or award[] rescissory damages." Compl. at 20. Thus, the denial of Plaintiff's Motion at most "may make [Plaintiff's] preferred remedy unavailable"; it will not cause irreparable harm. *Dipple v. Odell*, 870 F. Supp. 2d 386, 393 n.7 (E.D. Pa. 2012).

Plaintiff's contention that DGI stockholders will be unable to "cast a fully informed vote," thereby incurring irreparable harm, is also meritless. Mot. at 21. Plaintiff is not proceeding on behalf of a class of all DGI stockholders; he speaks only for himself. Courts across the country have rejected Plaintiff's argument because a purported inability to cast informed votes is insufficient to show irreparable harm in federal securities cases because "an adequate remedy at law remains in the form of money damages." *See Erickson*, 158 F. Supp. 3d at 760; *Malon*, 2014 WL 6791611, at *3 (same); *Calleros v. FSI Int'l, Inc.*, 892 F. Supp. 2d 1163, 1172 (D. Minn. 2012) (same).

## III. The Balance of Harms Does Not Support an Injunction.

If the Court were to enjoin the stockholder vote, the risk of harm to Defendants and DGI stockholders not before the Court would far outweigh any risk of harm to Plaintiff. In contrast to the three other Colorado actions—in which no plaintiff has sought a preliminary injunction—this is an individual action, not a putative class action. As a single stockholder, Plaintiff should not be permitted to hold hostage the vote of the entire stockholder class on a premium-generating $3.6 billion transaction. *See Malon*, 2014 WL 6791611, at *3 (refusing Section 14(a) injunction because "a single disgruntled

stockholder with a *de minimis* ownership interest . . . ha[d] no warrant to cast his claim as one on behalf of all the stockholders").  Plaintiff cites a number of cases purportedly supporting an injunction, but none is on point.  Three do not even involve a court enjoining a stockholder vote on a merger; the one that does is easily distinguishable.[19]

Further, Plaintiff is wrong that "the only conceivable inconvenience Defendants will face is a brief delay in the completion of the Proposed Transaction."  Mot. at 24. "Obviously, postponing the shareholder vote would entail significant hardship to [defendant], which has undoubtedly expended considerable money and time to arrange the process."  *See Malon*, 2014 WL 6791611, at *3.  More critically, an injunction could jeopardize the transaction, denying every other DGI stockholder the opportunity to collect a meaningful premium on their shares—as no better offer is on the table.  *See id*. (where proposed merger was only viable pending offer, "[t]here is no assurance in a fluctuating market that the opportunity will remain available on the terms negotiated").[20]

## IV.   An Injunction Would Be Adverse to the Public Interest.

Finally, an injunction would harm the public interest.  "[T]he public interest is not

---

[19] *See Am. Insured Mortg. Investors v. CRI, Inc.*, 1990 U.S. Dist. LEXIS 15787 (S.D.N.Y. Nov. 26, 1990 (injunction in context of exchange offer); *Lone Star*, 148 F. Supp. 2d 1141 (injunction in context of corporate election); *Allergan, Inc. v. Valeant Pharm. Int'l, Inc.*, 2014 U.S. Dist. LEXIS 156227 (C.D. Cal. Nov. 4, 2014) (injunction in context of tender offer).  As for the remaining case, the court delayed a stockholder vote where the plaintiffs—unlike Plaintiff here—demonstrated a likelihood of success on the merits, and defendants voluntarily issued supplemental disclosures to cure. *State of Wis. Inv. Bd. v. Bartlett*, 2000 Del. Ch. LEXIS 22, at *3 (Del. Ch. Feb. 9, 2000).
[20] *See also Herring v. Rite-Aid Corp.*, 2016 WL 401026, at *4 (M.D. Pa. Jan. 28, 2016) ("federal courts are reluctant to issue injunctions in cases such as these where there is no competitor offer"); *Dixon v. Cost Plus*, 2012 WL 2499931, at *12 (N.D. Cal. June 27, 2012) (same); *Calleros*, 892 F. Supp. 2d at 1174 (same).

served by enjoining a premium generating transaction." *See Erickson*, 158 F. Supp. 3d at 763.  As Plaintiff's own authority makes clear, "the public interest favors the ability of corporations and shareholders to govern their internal affairs without undue interference in advance of an expression of the will of all eligible shareholders through the voting of their shares." *La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*, 886 F. Supp. 2d 1255, 1270 (W.D. Okla. 2012).  Federal courts routinely refuse to issue an injunction where, as here, there is no competing offer.  *See, e.g.*, *Dixon*, 2012 WL 2499931, at *12.  DGI stockholders who are not before this Court—and whom Plaintiff does not represent—should decide the merger's fate for themselves.

**V.      If the Court Issues an Injunction, Plaintiff Must Post a Substantial Bond.**

Plaintiff's Motion is meritless and should be denied.  But if the Court disagrees, any injunctive relief should be conditioned on Plaintiff posting a substantial bond to protect Defendants and DGI stockholders against the risks inherent in a delay of the stockholder vote on this premium-generating transaction.  As Plaintiff concedes, Federal Rule of Civil Procedure 65 mandates that an injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); Mot. at 25.  Postponing the stockholder vote would force Defendants to incur substantial expenses, and it might cost stockholders of DGI's 62 million other shares the opportunity to gain a meaningful premium.  Ex. B at 14–15.

<u>CONCLUSION</u>

For the reasons above, Plaintiff's Motion should be denied.

Respectfully submitted this 29th day of June 2017.

O'MELVENY & MYERS LLP

By:  *s/ Matthew W. Close*
     Matthew W. Close
     William K. Pao
     400 South Hope Street, 18th Floor
     Los Angeles, CA 90071
     Phone: 213.430.7272
     Email:  mclose@omm.com
           wpao@omm.com

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:  *s/ John V. McDermott*
     John V. McDermott, #11854
     Emily R. Garnett, #45047
     410 Seventeenth Street, Suite 2200
     Denver, CO 80202
     Phone: 303.223.1100
     Email:   jmcdermott@bhfs.com
           egarnett@bhfs.com

*Attorneys for Defendants DigitalGlobe, Inc., General Howell M. Estes III, Nick S. Cyprus, Roxanne Decyk, Lawrence A. Hough, Warren C. Jenson, L. Roger Mason, Jr., Jeffrey R. Tarr, Kimberly Till, and Eddy Zervigon*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of June 2017, a true and correct copy of the foregoing **OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 19)** was served via CM/ECF, which will send notification of such filing upon the following:

Rusty E. Glenn
THE SHUMAN LAW FIRM
600 17th Street, Suite 2800 South
Denver, CO 80202
Phone: 303.861.3003
Fax: 303.536.7849
Email: rusty@shumanlawfirm.com

*Attorneys for Plaintiff*

*s/ Allecia Cavallaro*
Allecia Cavallaro, paralegal